**LAWRENCE–LEITER AND COMPANY, Plaintiff,**

v.

**Dale G. PAULSON, et al., Defendants.**

**Civil Action No. 96–2535–GTV.**

United States District Court, D.Kansas.

April 24, 1997.

James M. Ziegler, Gregory Leyh, Duane A. Martin, John F. Edgar, Humphrey, Farrington & McClain, Independence, MO, for Plaintiff.

Frederick H. Riesmeyer, II, Derron D. Gunderman, Spradley & Riesmeyer, P.C., Kansas City, MO, Gregory M. Garvin, David R. Nachman, Brown, Nachman & Sadar, P.C., Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

VAN BEBBER, District Judge.

This matter is before the court on plaintiff's motion for preliminary injunction (Doc. 3) and plaintiff's motion for civil contempt (Doc. 71). Defendants oppose both motions. Both motions are denied.

This action involves a dispute arising out of a business relationship gone sour. In its complaint, plaintiff asserts the following claims: breach of contract, unjust enrichment, tortious interference with contract, tortious interference with business relationship and expectancy, and libel. Plaintiff also filed a motion for temporary restraining order and a motion for preliminary injunction. Following a hearing before the court on December 13, 1996, the court granted plaintiff a limited temporary restraining order. In its order of December 17, 1997, the court restrained defendants from making the following allegedly defamatory statements to any of the persons or entities listed in plaintiff's Exhibit 3:(1) that plaintiff failed to meet its obligations; (2) that plaintiff greatly inflated the price of Allegiance®; (3) that plaintiff did not give contracts to defendants to review; and (4) that plaintiff did not pay defendants money owed on the contracts.

On March 26, 1997, the court held a hearing on both plaintiff's motion for preliminary injunction and its motion for civil contempt. After careful consideration of the parties' evidence and arguments, the court denied both of plaintiff's motions and dissolved the temporary restraining order. This memorandum and order is to memorialize the court's reasons for denying the motions.

Pursuant to Fed.R.Civ.P. 52(a), the court makes the following findings of fact and conclusions of law.

### I. Findings of Fact

1. Plaintiff Lawrence–Leiter and Company is a Missouri corporation with its principal place of business in Fairway, Kansas. Plaintiff is a citizen of Missouri and Kansas.

2. Defendant Dale G. Paulson, Ph.D. ("Dr.Paulson"), is a citizen of Virginia.

3. Defendant Leah Paulson is a citizen of Virginia.

4. Dr. Paulson does business as ALLEGIANCE®, ALLEGIANCE® for Associations, and Association Research Group in Alexandria, Virginia.

5. The court has diversity jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $50,000, exclusive of interest and costs.

6. Venue is proper in this court pursuant to 28 U.S.C. § 1391(a) because defendant

agreed to the terms and executed the contract that gives rise to this action in Kansas.

7. Plaintiff is engaged primarily in the business of providing a broad range of consulting services to associations and professional societies throughout the United States. The consulting services that plaintiff offers includes membership surveys, market research, training, and recruiting. Plaintiff has been involved in this business since 1950 and derives its income from the fees it charges various associations for the consulting services it performs.

8. Dr. Paulson authored and is the registered owner of ALLEGIANCE®. He also is the owner and holder of the following service marks and/or trademarks: ALLEGIANCE®, Mailboxers™, Relevant Participants®, Shapers™, CompShoppers®, Cognoscenti®, Status Conscious®, Altruistics®, Doubters®, Non–Relevants®, and T.A.G.S.®.

9. In 1990, Dr. Paulson developed the ALLEGIANCE® Target Marketing system ("Allegiance"). Allegiance is a market segmentation system that allows associations to survey their members in order to extrapolate segments or categories of the membership and to identify the areas of interest of individual members of the association. Through this segmentation or categorization, an association can target its services and its marketing efforts to the appropriate members.

10. Dr. Paulson began marketing Allegiance to associations in 1993.

11. In early 1996, Dr. Paulson contacted plaintiff and inquired whether plaintiff would be interested in becoming a marketing agent for Allegiance. Not only did plaintiff respond favorably to Dr. Paulson's inquiry, plaintiff informed Dr. Paulson that it wanted to become the exclusive marketing agent for Allegiance.

12. The parties negotiated a marketing agreement in March and April 1996. As a result of their discussions, the parties reached an agreement whereby plaintiff would become the exclusive marketing agent for Allegiance. On April 22, 1996, the parties reduced to writing and executed their agreement.

13. The letter agreement between the parties outlined their respective obligations in marketing Allegiance. The parties agreed that: (1) plaintiff would be the exclusive national marketing agent for Allegiance (except for pre-existing contracts and for five new contracts that Dr. Paulson could sell each year); (2) plaintiff would provide Dr. Paulson with copies of all contracts and keep him informed of plaintiff's progress in marketing Allegiance; (3) the parties would divide the proceeds from each sale of Allegiance, with plaintiff receiving thirty percent of the gross income to cover costs and expenses and the remaining seventy percent divided equally between plaintiff and Dr. Paulson; (4) Dr. Paulson would receive five percent of the fees generated from consulting contracts generated from the sale of Allegiance; and (5) the parties would work together to establish the fee schedule for Allegiance.

14. Subsequently, both parties expended time and money to market Allegiance. In determining which associations to target, plaintiff came up with a prospective customer list by combining a list of association contacts that Dr. Paulson provided with plaintiff's own list of association contacts.

15. Plaintiff and Dr. Paulson also developed the price list for the sale of Allegiance. The parties agreed that an association wanting to use Allegiance would have to commit to a term of three years. An association would incur a substantial penalty if it cancelled the contract prior to the expiration of the three-year term.

16. Plaintiff actively marketed Allegiance throughout the country. Plaintiff's marketing efforts consisted of personal sales calls, purchasing a booth and advertising at a national convention for associations, the production and distribution of a videotape detailing the Allegiance system, seminars conducted for various associations, and proposals being sent to numerous associations.

17. One of the associations that plaintiff targeted was the American Production and Inventory Control Society ("APICS"). In June 1996, plaintiff sent a proposal to APICS that outlined the strategic planning services that plaintiff could provide the as-

sociation. As part of its proposal, plaintiff recommended conducting a survey of APICS's members. Plaintiff did not provide Dr. Paulson with a copy of the proposal. By subsequent correspondence, plaintiff's representative, David Domsch, suggested that the survey include components of Allegiance. Domsch informed APICS that the use of Allegiance in the survey would not affect the price that plaintiff quoted in the original proposal.

18. APICS submitted a purchase order to plaintiff in July 1996 that authorized the payment of $28,000 to plaintiff upon completion of the survey. Plaintiff did not provide Dr. Paulson with a copy of the purchase order.

19. During the summer of 1996, plaintiff also prepared and submitted detailed proposals to the Business Owners and Managers Association ("BOMA") and the American College of Radiology ("ACR") for the use of Allegiance and plaintiff's strategic planning services. Dr. Paulson did not receive a copy of either proposal.

20. Plaintiff had not submitted any contracts for the sale of Allegiance to Dr. Paulson through August 1996. In September 1996, Dr. Paulson informed plaintiff that he was disappointed in plaintiff's performance inasmuch as plaintiff had not been able to procure any Allegiance contracts. At that time, plaintiff indicated that the main reason for the lack of Allegiance sales was price resistance; associations were balking at having to commit for three years.

21. On October 1, 1996, plaintiff sent Dr. Paulson a telefacsimile that included a portion of the survey report that plaintiff submitted to APICS. The report detailed plaintiff's conclusions concerning the Allegiance survey it completed for APICS. This was the first information that Dr. Paulson had received regarding the use of Allegiance for APICS.

22. By his letter of October 4, 1996, Dr. Paulson informed plaintiff that he believed the three-year commitment was too intimidating and that Allegiance should be sold for a one-year term. Dr. Paulson also stated that he did not think plaintiff had the re-

sources to market Allegiance nationally, and that he wanted to amend the parties' agreement with respect to the exclusive marketing provision. Dr. Paulson proposed dividing the sales territory into seven regions with plaintiff marketing Allegiance in only one region.

23. Plaintiff's representative, David Bywaters, replied to Dr. Paulson's letter on October 8, 1996. In that letter, Bywaters indicated that plaintiff would not accept a regional representation format for marketing Allegiance. In explaining that plaintiff was making inroads with prospective Allegiance clients, Bywaters informed Dr. Paulson for the first time that plaintiff had three active clients using the Allegiance system. Plaintiff had not provided Dr. Paulson with a contract or any other information concerning the associations who were using Allegiance. Additionally, Dr. Paulson had not been compensated for the use of Allegiance.

24. Dr. Paulson responded by letter to Bywaters' communication, informing plaintiff that, as of October 14, 1996, it was no longer authorized to market Allegiance. In terminating the letter agreement of April 22, 1996, Dr. Paulson based his decision on Bywaters' written representation that plaintiff had three active clients using Allegiance and Domsch's telefacsimile concerning the report to APICS detailing the results of an Allegiance survey.

25. By letter dated October 18, 1996, plaintiff informed Dr. Paulson that it was rejecting his attempt to terminate their contract and that plaintiff would continue its efforts to market Allegiance.

26. Subsequently, Dr. Paulson sent letters to associations that plaintiff had contacted about using Allegiance in which he stated that he had fired plaintiff for several reasons, including: (1) plaintiff's failure to meet its obligations, (2) plaintiff's inflation of the pricing for Allegiance, (3) plaintiff's failure to provide Dr. Paulson with Allegiance contracts to review, and (4) plaintiff's failure to pay Dr. Paulson monies owed for the use of Allegiance.

27. Upon learning of the content of those letters, plaintiff filed its complaint, motion for

temporary restraining order, and motion for preliminary injunction.

28. Following the court's issuance of a temporary restraining order that prohibited Dr. Paulson from making the allegedly defamatory statements, Dr. Paulson continued to send letters and proposals to associations in an attempt to market Allegiance. In those letters, Dr. Paulson stated that the current pricing for Allegiance was significantly lower than plaintiff's pricing.

29. In December 1996, plaintiff caused an article to be published in "Association Trends" magazine, an industry publication. The article detailed plaintiff's claims against Dr. Paulson, including the allegations concerning the publication of defamatory letters to plaintiff's current and potential clients.

30. Following the filing of his answer, Dr. Paulson caused an article to be published in "Association Trends" concerning his counterclaims against plaintiff, including his claim for punitive damages based on plaintiff's alleged willful, wanton, and malicious actions.

## II. Conclusions of Law

The court first will discuss plaintiff's motion for preliminary injunction, and then will proceed to plaintiff's motion for civil contempt.

### A. Motion for Preliminary Injunction

█ Plaintiff seeks the court's order of a preliminary injunction to prohibit defendants' use of allegedly defamatory statements until resolution of this action at trial. Plaintiff claims that defendants' actions in uttering or publishing the allegedly defamatory statements to associations with whom plaintiff conducts business is harming plaintiff's business reputation, goodwill, and contractual relations.

To obtain a preliminary injunction, plaintiff bears the burden of satisfying four elements: (1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). The determination of whether plaintiff satisfies the elements rests with the court's sound discretion. *Id.; see also Equifax Servs., Inc. v. Hitz,* 905 F.2d 1355, 1360 (10th Cir.1990)(district court's grant of a preliminary injunction reversed "only for abuse of discretion"); *Penn v. San Juan Hosp., Inc.,* 528 F.2d 1181 (10th Cir.1975).

For a preliminary injunction to issue, plaintiff first must demonstrate a "reasonable probability of success" on the merits. *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen,* 640 F.2d 255, 261 (10th Cir.1981). Plaintiff contends that there is a reasonable probability that it will succeed on its claim that defendants' publication of allegedly defamatory statements is libelous.

█ The court must determine which state's substantive law governs. In a diversity of citizenship action such as this, the court must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). For tort actions, Kansas applies the *lex loci delicti* approach; the law of the "place of the wrong" controls. *Ling v. Jan's Liquors,* 237 Kan. 629, 634, 703 P.2d 731 (1985). Determining the "place of the wrong" requires the court to look to that place "where the last event necessary to impose liability took place." *Raymark Indus., Inc. v. Stemple,* 714 F.Supp. 460, 465 (D.Kan.1988). The Kansas Supreme Court has not addressed the issue of where the place of the wrong is in a defamation case involving parties of diverse citizenship. In the present case, the court will apply Kansas law because plaintiff's domicile, Kansas, was the situs of plaintiff's injury from the allegedly defamatory statements. *See Fouts v. Fawcett Publications, Inc.,* 116 F.Supp. 535, 537 (D.Conn. 1953) (in applying Kansas law in a defamation case, the court held that plaintiff suffered its injury in its place of domicile).

█ Under Kansas law, the tort of defamation, which includes both libel and slander, includes three elements: "(1) false and de-

famatory words; (2) communication to a third party; and (3) ... harm to the reputation of the person defamed." *Batt v. Globe Eng'g Co., Inc.*, 13 Kan.App.2d 500, 504, 774 P.2d 371 (1989); *see also Luttrell v. United Tel. Sys., Inc.*, 9 Kan.App.2d 620, 683 P.2d 1292 (1984). Defendants argue that they made true, non-defamatory statements about plaintiff, and, therefore, plaintiff is not likely to succeed on the merits of its defamation claim. The court agrees.

In *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 598, 738 P.2d 1246 (1987), the Kansas Supreme Court held that:

[f]or there to be liability for defamation, there must be a publication of a matter that is both defamatory and false. In civil actions for libel where the defendant establishes the truth of the matter charged as defamatory, the defendant is justified in law, and exempt from all civil responsibility. Where the published statements are substantially true, there is no liability....

*Id.* at 598, 738 P.2d 1246 (citations omitted); *see also Redmond v. Sun Publ'g Co.*, 239 Kan. 30, 37, 716 P.2d 168 (1986). Consequently, truth is a complete defense. *High v. A.J. Harwi Hardware Co.*, 115 Kan. 400, 405, 223 P. 264 (1924).

The evidence demonstrates that the claims in defendants' letters to prospective Allegiance clients were substantially true. Plaintiff contends that defendants have made four allegedly defamatory claims in letters to prospective Allegiance clients. The first allegedly defamatory statement is that plaintiff failed to meet its contractual obligations. Under the parties' letter agreement, plaintiff agreed to give Dr. Paulson an opportunity to review all contracts and to keep Dr. Paulson informed of plaintiff's progress in the presentation and sale of Allegiance. Dr. Paulson testified that he did not receive copies of Allegiance proposals submitted to APICS, BOMA, or ACR. Dr. Paulson further stated that he did not receive a copy of the agreement between plaintiff and APICS for the use of Allegiance in a membership survey or a copy of the finished survey report. Thus, Dr. Paulson's statement that plaintiff failed to meet its contractual obligation is substantially true.

Defendants also have stated that plaintiff did not give contracts to Dr. Paulson for review and that plaintiff did not pay Dr. Paulson the compensation owed on those contracts. In his October 8, 1996, correspondence, Bywaters informed Dr. Paulson for the first time that plaintiff had acquired three active Allegiance clients. Dr. Paulson testified that he had not received the contracts to review for those clients nor had plaintiff compensated Dr. Paulson for the use of Allegiance. Consequently, the statements by Dr. Paulson concerning plaintiff's failure both to provide contracts for review and to compensate for the use of Allegiance are substantially true.

The final statement attributed to defendants was that plaintiff greatly inflated the price of Allegiance. The evidence concerning this statement is not entirely clear. Overall, however, the claims contained in defendants' letters were substantially true. The court finds that plaintiff has not presented sufficient evidence to demonstrate a likelihood of success on its defamation claim. Because plaintiff's request for injunctive relief focused on the allegedly defamatory statements, the court need not address plaintiff's likelihood of success on the merits of its claims for breach of contract, unjust enrichment, tortious interference with contract, and tortious interference with business relationship and expectancy.

The court further finds that plaintiff has not clearly shown that it will suffer irreparable harm if an injunction does not issue. The court is of the opinion that if plaintiff prevails at trial, an award of damages can suffice as reparation for the harm. The court concludes that a preliminary injunction in this action is inappropriate.

## B. Motion for Civil Contempt

In its motion for civil contempt, plaintiff complains that defendants have violated the court's order prohibiting defendants from making certain allegedly defamatory statements. This case demonstrates graphically the difficulties the court encounters when it attempts to enjoin the making of certain statements.

Because civil contempt is a severe remedy, plaintiff bears a heavy burden. *See NLRB v. Shurtenda Steaks, Inc.*, 424 F.2d 192, 194 (10th Cir.1970). Plaintiff must prove civil contempt by clear and convincing evidence. *See Heinold Hog Mkt., Inc. v. McCoy*, 700 F.2d 611, 614 (10th Cir.1983). Specifically, plaintiff must establish that defendants have "not diligently attempted to comply in a reasonable manner with a court order." *T.Y. v. Board of County Comm'rs of County of Shawnee*, 912 F.Supp. 1424, 1427 (D.Kan.1996)(citing *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995)).

Plaintiff has failed to present the court with clear and convincing evidence that defendants violated the court's temporary restraining order. The letters that defendants sent out subsequent to the court's order do not state that plaintiff greatly inflated the price of Allegiance. Rather, defendants stated merely that their price for Allegiance was substantially lower than the price the plaintiff charged. Additionally, the article that defendants caused to be published in the industry magazine, "Association Trends," was a factual news story detailing defendants' countersuit against plaintiff. Moreover, the most recent article was in response to an article that plaintiff caused to be published in the same publication following its filing of the lawsuit against defendants. The court denies plaintiff's motion for civil contempt because plaintiff has not demonstrated that an order of contempt is justified in this case.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiff's motion (Doc. 3) for a preliminary injunction is denied.

IT IS FURTHER ORDERED that the court's December 17, 1996, temporary restraining order is dissolved.

IT IS FURTHER ORDERED that plaintiff's motion (Doc. 71) for civil contempt is denied.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**