**Paula Corbin JONES, Plaintiff,**

v.

**William Jefferson CLINTON and Danny Ferguson, Defendants.**

**No. LR–C–94–290.**

United States District Court, E.D. Arkansas, Western Division.

July 29, 1999.

720

Donovan Campbell, Jr., Rader, Campbell, Fisher & Pyke, Dallas, TX, Gregory S. Kitterman, Little Rock, AR, for plaintiff.

Steven H. Aden, John W. Whitehead, The Rutherford Institute, Charlottesville, VA, Daniel A. Gecker, Steven Scott Biss, Maloney, Huennekens, Parks, Gecker, Parsons, Richmond, VA, Robert Batton, Jacksonville, AR, Bill W. Bristow, Seay & Bristow, Jonesboro, AR, Stephen C. Engstrom, Wilson, Engstrom, Corum & Coulter, Little Rock, AR, Kathlyn Graves, Wright, Lindsey & Jennings, Little Rock, AR, Robert S. Bennett, Skadden, Arps, Slate, Meaghen & Flom, Washington, DC, for defendants.

## MEMORANDUM AND ORDER

SUSAN WEBBER WRIGHT, Chief Judge.

On April 12, 1999, this Court entered a Memorandum Opinion and Order adjudging William Jefferson Clinton, President of the United States, to be in civil contempt of court pursuant to Fed.R.Civ.P. 37(b)(2) for his willful failure to obey certain discovery Orders of this Court in a lawsuit brought against him by Paula Corbin Jones. *See Jones v. Clinton,* 36 F.Supp.2d 1118 (E.D.Ark.1999). The Court determined that the President violated this Court's discovery Orders by giving false, misleading and evasive answers that were designed to obstruct the judicial process, and that sanctions must be imposed, not only to redress the misconduct of the President in this case, but to deter others who might themselves consider emulating the President of the United States by engaging in misconduct that undermines the integrity of the judicial system. *See id.* at 1127, 1131–32, 1134. The Court ordered the President to pay plaintiff any reasonable expenses, including attorney's fees, caused by his willful failure to obey this Court's discovery Orders, and directed plaintiff's former counsel to submit to this Court a detailed statement of any expenses and attorney's fees incurred in connection with the matter. *Id.* at 1132, 1134–35. The Court additionally ordered the President to deposit into the registry of this Court the sum of $1,202.00, the total expenses incurred by this Court in traveling to Washington, D.C. at the President's request to preside over his January 17, 1998 deposition. *Id.*[1] However, the Court stayed enforcement of its Order for thirty days to give the President an opportunity to file a notice of appeal or to request a hearing in which to demonstrate why he is not in civil contempt of court, why sanctions should not be imposed, or why the Court is otherwise in error in proceeding in the manner in which it has. *Id.* at 1134–35. The Court stated that should the President fail to file a notice of appeal or request a hearing within the time allowed, it would enter an Order setting forth the time and manner by which the President is to comply with the sanctions being imposed. *Id.* The President subsequently notified this Court that while he disputes allegations that he knowingly and intentionally gave false testimony under oath, he will not request a hearing or file a notice of appeal. Accordingly, the Court addresses at this time the sanctions to be imposed in accordance with the April 12th Order.

## I.

On May 7, 1999, this Court received in response to its April 12th Order a statement of fees and expenses totaling $437,825.00 from the law firm of Rader, Camp-

1. In addition, the Court referred the matter to the Arkansas Supreme Court's Committee on Professional Conduct for review and any action it deems appropriate. *Id.*

bell, Fisher & Pike ("RCFP") and a statement of fees and costs totaling $58,-533.03 from John W. Whitehead and The Rutherford Institute (collectively, "TRI"). That same day, the President, through his attorney, Robert S. Bennett, submitted a letter to this Court stating that he would timely file a formal pleading objecting to the "excessive" amount of the claim for fees and expenses by plaintiff's attorneys—characterizing the claim as "unreasonable and inconsistent with the Court's Order and governing law"—but that he did not otherwise intend to request a hearing or file a notice of appeal with respect to the April 12th Order. *See* May 7, 1999 Letter.

On May 21, 1999, the President filed his formal response to the statements of fees and expenses submitted by plaintiff's attorneys. In his response, the President states that due to the public interest in providing an expeditious resolution to this matter, and due to the urgent duties of his office, he recognizes that it is in the best interests of the country to forego his right to a hearing under the Order.[2] Resp. of Pres. at 1. The President further states that while he does not concur with the findings of this Court, he will pay the $1,202.00 levied by this Court for its expenses in attending his January 17th deposition at his request, and will pay the reasonable costs incurred by plaintiff as a result of those actions that this Court found to be at odds with its discovery Orders—his answer to Interrogatory No. 10, submitted on December 23, 1997, and certain limited portions of his January 17th deposition testimony, insofar as either pertained to his relationship with Monica Lewinsky. *Id.* at 1–2. As in his May 7th letter, however, the President contends that the fees and expenses requested by RCFP and TRI are unreasonable in that for the most part they bear no relationship to the actions that gave rise to the April

12th Order, are "demonstrably overreaching," and, with the exception of certain fees and expenses in the range of $12,300.00 to $33,700.00, should thus be denied. *Id.* at 2–3.

RCFP and TRI each filed a reply to the President's response. RCFP asserts that the work included in their statement of fees and expenses is directly related to the President's misconduct and that the President's dishonesty caused their work, both before and after the specific instances of his misconduct referenced in this Court's April 12th Order, to be rendered useless. Reply of RCFP at 2–3. TRI, in turn, asserts that the sanctions proposed by the President, "if adopted by this Court, would do precious little to 'redress the misconduct of the President in this case,'" and would not only fail to deter others who might consider emulating the President's misconduct, "but would actually serve to create an unintended incentive for such conduct by imposing *de minimus* consequences on conduct that, in the words of [this] Court, has 'undermined the integrity of the judicial system' itself." Reply of TRI at 1–2 (quoting April 12th Order).

█ The Court has carefully considered the pleadings submitted in response to this Court's April 12th Order (doc.#'s 488–497) and, without objection, will require that the President pay the $1,202.00 levied by this Court for its expenses in attending his January 17th deposition at his request and will require that the President pay the reasonable fees and expenses incurred by plaintiff as a result of those actions that this Court found to be at odds with its discovery Orders. The Court finds, however, that the claims for fees and expenses included in RCFP's and TRI's statements are excessive and must be reduced.

A.

█ As a preliminary matter, the Court addresses a motion filed by RCFP and

---

2. The Court expressed these same concerns in its April 12th Order. *See Jones v. Clinton,* 36

F.Supp.2d at 1132–34.

joined by TRI to conduct limited discovery of the President's attorneys' fees and expenses. RCFP seeks to determine the amount of time expended by the lawyers who represented the President in connection with his contemptible conduct, the hourly rates charged for that work, and the nature and amount of the expenses incurred in connection with that work. Mot. of RCFP at 1. RCFP states that this discovery is necessary in light of the position taken by Mr. Bennett in his May 7th letter to this Court. *Id.*

The Court denies RCFP's motion. The President does not contest RCFP's and TRI's billing rate or the amount of time spent on any given task, but simply opposes their statements insofar as he claims the fees and expenses included therein were not incurred as a result of the conduct sanctioned by this Court, or because their statements are too vague to assess any possible link between the claimed costs and the sanctioned conduct. Resp. of Pres. at 2–3. There is no need to conduct discovery of the President's attorneys' fees and expenses in order for this Court to determine whether the fees and expenses claimed by RCFP and TRI were in fact incurred as a result of the conduct sanctioned by this Court.[3]

Moreover, this Court has determined that resolving the issue of the President's contempt expeditiously and without hearings is in the public interest, *see Jones v. Clinton*, 36 F.Supp.2d at 1127, 1133, and granting RCFP's motion for additional discovery would only delay its resolution. Indeed, it was in the interests of bringing this matter to a speedy closure that this Court addressed in its April 12th Order only those narrow aspects of the President's contemptuous conduct with which there was no factual dispute and which were fully apparent from the record. *See id.* at 1127, 1132–33. The Court fully recognized that the President and other individuals within the jurisdiction of this Court might have engaged in additional misconduct warranting the imposition of sanctions, including violations of the Court's Confidentiality Order on Consent of all Parties. *See id.* at 1127 n. 14, 1132–33. Ascertaining whether the President or other individuals violated the Confidentiality Order or engaged in other sanctionable misconduct, however, would require hearings and the taking of evidence. *See id.* The President's misconduct as set forth in the April 12th Order, by contrast, is fully apparent from the record and can be summarily addressed without convening evidentiary hearings. Were additional discovery on the part of RCFP and TRI allowed, the Court, in fairness, would allow the President to conduct discovery of RCFP and TRI as well. The history of this case suggests that such additional discovery, rather than being limited, would be "contentious and time-consuming." *See id.* at 1121. Given that prospect, the Court would be inclined to expand the proceedings to address possible misconduct beyond that addressed in the April 12th Order, including any possible misconduct on the part of RCFP and/or TRI.

The Court finds, however, that additional discovery and expansion of the proceedings is not necessary at this time as the record is sufficiently developed for this Court to determine whether the fees and expenses claimed by RCFP and TRI were

---

**3.** RCFP states that discovery of the President's attorneys' fees and expenses will make clear the appropriate magnitude of the fees which should be awarded pursuant to this Court's April 12th Order. Reply of RCFP at 14. They state that the President's expenditure of fees may well be the best evidence of his own valuation of the case, and that a sanction amounting to a mere ten percent of that value is not out of proportion. *Id.* The Court is not, however, concerned with the amount of fees expended by the President's attorneys in defending their client, but is only concerned with the amount of reasonable fees and expenses incurred by plaintiff's former counsel as a result of the President's willful failure to obey this Court's discovery Orders as described in the April 12th Order. The Court will not base any such sanction on a percentage of the President's attorney's fees and expenses.

incurred as a result of the conduct sanctioned by this Court. That being so, and in the interests of bringing this matter to a speedy closure, the Court will deny RCFP's motion to conduct limited discovery.

## B.

### 1.

The Court now turns to the central issue at hand: determining whether the fees and expenses included in the statements of RCFP and TRI are within the scope of this Court's April 12th Order. There are two kinds of civil contempt sanctions a court can impose: coercive and compensatory. *Klett v. Pim*, 965 F.2d 587, 590 (8th Cir.1992) (citations omitted). A coercive sanction, such as a fine, is designed to force the offending party to comply with a court's order, whereas a compensatory sanction is designed to compensate the non-offending party for the damage they incur as a result of the offending party's contempt. *Id. See also Hartman v. Lyng*, 884 F.2d 1103, 1106 (8th Cir.1989) (a court's civil contempt power serves two purposes: to effectuate compliance with a court's order or process, and to compensate individuals from harm incurred by noncompliance); *Thompson v. Cleland*, 782 F.2d 719, 721 (7th Cir.1986) (" '[j]udicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance

with the court's order, and to compensate the complainant for losses sustained' ") (quoting *United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)); *In re Kave*, 760 F.2d 343, 351 (1st Cir.1985) (civil contempt sanctions can include a conditional fine to induce the purging of contemptuous conduct and "a *compensatory* fine to make whole the aggrieved party for damages caused by the contemnor's conduct") (emphasis in original). The matter of the President's contempt involves compensatory rather than coercive sanctions as the Court is not seeking to coerce the President into compliance with any pending Court order—the underlying action having been dismissed [4]—and sanctions are being imposed, not only to deter others who might consider emulating the President's misconduct, but to compensate the plaintiff by requiring that the President pay her any reasonable fees and expenses caused by his willful failure to obey this Court's discovery Orders. *See Jones v. Clinton*, 36 F.Supp.2d at 1131–32, 1134–35. *See also Lyng*, 884 F.2d at 1106 (a compensatory sanction "serves to make reputation to the injured party, restoring that party to the position it would have held had the court's order been obeyed") (citation omitted). Accordingly, this Court must determine the sum total of reasonable fees and expenses that plaintiff incurred as a result of the President's willful failure to obey this Court's discovery Orders.[5]

---

**4.** As the Court noted in its April 12th Order, "[a] Court may make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated." *Jones v. Clinton*, 36 F.Supp.2d at 1125 n. 12 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). In this regard, and contrary to the assertions of certain commentators, discovery sanctions under Fed.R.Civ.P. 37 may be awarded against a party after entry of summary judgment and dismissal of a case pursuant to Fed.R.Civ.P. 56. *See Heinrichs v. Marshall and Stevens Inc.*, 921 F.2d 418, 420–21 (2nd Cir.1990). Indeed, "[g]iven the Supreme Court's approval of post-judgment sanctions under Rule 11,

and the support in the circuits for the practice under Rule 37, the question of post-judgment sanctions under Rule 37 is virtually moot." Stephen R. Bough, *Spitting in a Judge's Face: The 8th Circuit's Treatment of Rule 37 Dismissal and Default Discovery Sanctions*, 43 S.D.L.Rev. 36, 43 (1998) (footnote omitted).

**5.** The President argues that TRI's statement should be rejected in its entirety as TRI's role in this litigation was to raise funds and coordinate public relations for plaintiff, TRI did not enter an appearance until the appeal of this Court's dismissal of the case (although TRI was shown as "of counsel". on plaintiff's pleadings), TRI's statement was untimely, and

### 2.

This Court found that the President's sworn statements concerning whether he and Ms. Lewinsky had ever been alone together and whether he had ever engaged in sexual relations with Ms. Lewinsky—specifically, his answer to Interrogatory No. 10, submitted on December 23, 1997, and certain limited portions of his January 17th deposition testimony—were in violation of this Court's discovery Orders ruling that plaintiff was entitled to information regarding any individuals with whom the President had sexual relations or proposed or sought to have sexual relations and who were during the relevant time frame state or federal employees. *See Jones v. Clinton*, 36 F.Supp.2d at 1127. Notwithstanding the narrow and specific nature of the misconduct referenced in the April 12th Order, RCFP and TRI include in their respective statements claims for fees and expenses which clearly cannot be said to have been caused by the misconduct upon which this Court's April 12th Order is based. These include fees and expenses associated with various Court proceedings and conferences; fees and expenses associated with the investigation by the Office of the Independent Counsel ("OIC") of the Lewinsky matter and OIC's involvement in this civil case; fees and expenses associated with this Court's evidentiary ruling excluding the Lewinsky evidence from trial and plaintiff's mandamus petition seeking to reverse that ruling; fees and expenses associated with various press conferences, researching and reviewing media reports, and reviewing correspondence; and fees and expenses associated with examining the Starr Report.

Both RCFP and TRI appear to justify the breadth of the fees and expenses included in their statements by arguing, at least in part, that sanctions may be imposed to punish the President's miscon-

duct. RCFP argues, for example, that the President's willful failure to follow this Court's discovery Orders "made a mockery" of both his deposition and all of the proceedings and orders leading up to the deposition, and that he should therefore be made to pay for all of the work done and expenses incurred in the course of events leading up to his deposition and, in particular, all efforts to discover facts concerning Monica Lewinsky. Reply of RCFP at 2–4. Similarly, TRI asserts that the contemptuous conduct of the President was a "substantial factor" in each of the events for which costs and/or attorney's fees are being sought, and, as previously noted, cautions this Court against imposing *de minimis* consequences on conduct that undermined the integrity of the judicial system. Reply of TRI at 2–3.

■ The Court rejects RCFP's and TRI's apparent understanding of the basis upon which compensatory sanctions may be imposed. Regardless of whether the President's failure to follow this Court's discovery Orders "made a mockery" of the proceedings or even was a "substantial factor" in the events for which fees and expenses are being sought, sanctions for compensatory contempt are not imposed to punish the contemnor, *see Lyng*, 884 F.2d at 1106, but must be based upon evidence of actual loss. *Law v. NCAA*, 134 F.3d 1438, 1443 (10th Cir.1998). *See also Burke v. Guiney*, 700 F.2d 767, 770 (1st Cir.1983) (a compensatory fine for civil contempt requires proof of damages). Avoiding imposition of compensatory sanctions that may be characterized as *"de minimus"* simply is not a consideration in determining whether actual loss has been shown.

The Court also rejects RCFP's argument that because this Court properly could have imposed the sanction of entering judgment against the President on the

---

the information contained in TRI's statement is "extremely vague." Resp. of Pres. at 8–9. Although the Court will not reject TRI's statement, the Court will consider any vagueness of TRI's statement, as it will with RCFP's statement, in determining the reasonable fees and expenses that plaintiff incurred as a result of the President's misconduct.

basis of his contempt of court,[6] plaintiff's counsel would have been justified in seeking compensation for all of their labor and reimbursement for all of the expenses incurred following the President's false answer to Interrogatory No. 10, submitted on December 23, 1997. *See* Reply of RCFP at 12–13. Specifically, RCFP argues that upon the service of the President's false response to plaintiff's interrogatories, he had a continuing obligation as an officer of the Court and a party subject to the Court's discovery orders to disclose the falsity of his response, and that judgment could have been entered against the President upon such disclosure. *Id.* Such a judgment, argues RCFP, could have been entered against the President upon his disclosure of the falsity of his response and would have obviated the need for any further legal services to be rendered or expenses incurred by plaintiff's counsel. *Id.* RCFP's argument, however, overlooks the probability that any damages awarded to plaintiff as a result of a judgment entered against the President for his civil contempt would not have been based on any fees and expenses incurred by her counsel as a result of the conduct described in this Court's April 12th Order, but would have been damages that plaintiff herself could prove at a subsequent hearing, *i.e.*, damages for alleged deprivation of her constitutional rights and privileges, damages for alleged conspiracy to deprive her of her equal protection and privileges

of the laws, and damages for alleged intentional infliction of emotional distress (Counts I–III of plaintiff's amended complaint). Even in the unlikely event that the Court would forego such a hearing on damages, the amount of the judgment would be no greater than the specific amount stated in plaintiff's amended complaint, which is $525,000.[7] Because the parties have already settled this case for $850,000, it is appropriate to limit fees and expenses to those incurred as a result of the misconduct upon which the Court's April 12th Order is based and not engage in speculation concerning what the Court might have ordered had its grant of summary judgment to defendants been reversed on appeal and the case remanded.

■ There is no need to burden today's Memorandum and Order with an exhaustive, entry-by-entry review of the fees and expenses claimed by RCFP and TRI in determining the sum total of reasonable fees and expenses that plaintiff incurred as a result of the President's willful failure to obey this Court's discovery Orders. The parties have addressed RCFP's and TRI's statements by establishing general categories of time entries, and this Court will address those statements in the same manner.[8]

### a.

The Court will disallow fees and expenses incurred prior to December 23,

---

**6.** This Court noted in its April 12th Order that the Court would have considered rendering a default judgment against the President pursuant to Fed.R.Civ.P. 37(b)(2) had this Court's grant of summary judgment to defendants been reversed on appeal and the case remanded. *See Jones v. Clinton,* 36 F.Supp.2d at 1131.

**7.** Plaintiff's initial complaint sought $700,000. Following the entry of this Court's Memorandum Opinion and Order granting in part and denying in part the President's motion for judgment on the pleadings, *see Jones v. Clinton,* 974 F.Supp. 712 (E.D.Ark.1997), and following the entry of new counsel for plaintiff in this case, plaintiff filed an amended complaint (with leave of this Court) in which she sought $525,000 [doc.#176]. The Court recog-

nizes that plaintiff's amended complaint seeks damages in an amount to be determined by a jury and that the $525,000 figure represents the minimum sought by plaintiff for the conduct referenced in Counts I–Ill of the amended complaint.

**8.** The Court has engaged in a painstaking review of each time entry and claim for costs set forth in RCFP's and TRI's respective statements in determining whether the fees and expenses claimed therein were caused by the discovery violations referenced in the Court's April 12th Order. All claims for fees and expenses not specifically mentioned in today's Memorandum and Order have been carefully considered by the Court and are hereby denied.

1997. Work done prior to that date *a fortiori* was not caused by the President's discovery violations on December 23, 1997, and January 17, 1998.

b.

The Court will disallow fees and expenses associated with the hearing in Pine Bluff, Arkansas on January 12, 1998. This hearing was convened by the Court on its own initiative primarily to address the President's upcoming deposition. Monica Lewinsky's name was mentioned only briefly during the hearing in response to this Court's query regarding witnesses plaintiff anticipated calling at trial, and a wide variety of topics were addressed, including the possibility of settlement. This hearing did not result from the discovery violations referenced in the Court's April 12th Order.

c.

The Court will allow a portion of the fees and expenses associated with the President's January 17th deposition. The President objects to such an award, arguing that he would have been deposed regardless of any discovery violations and that plaintiff thus would have incurred fees and expenses associated with the deposition irrespective of any misconduct on his part. While that may be true, the President's failure to follow this Court's discovery Orders resulted in plaintiff's counsel devoting extra time, effort, and expense to certain topics that likely would have been unnecessary had he been truthful. Plaintiff therefore incurred fees and expenses in connection with the President's deposition as a result of his discovery violations.

The Court does find, however, that fees and expenses should be limited to time spent asking questions about Ms. Lewinsky. In this regard, the President claims, and the Court agrees, that approximately 20% of the President's deposition concerned Ms. Lewinsky. Plaintiff's counsel do not contest this percentage, but merely argue that the President's falsehoods infected the entire record with doubt and that plaintiff therefore is entitled to reimbursement for all fees and expenses associated with the deposition. As previously noted, however, compensatory sanctions must be based on evidence of actual loss, *see NCAA*, 134 F.3d at 1443, and the Court finds that plaintiff's counsel have established evidence of actual loss, at most, with respect to no more than 20% of their claim for fees and expenses associated with the deposition.[9] Accordingly, as so reduced, RCFP is entitled to $5,233.00 for fees and expenses associated with the President's deposition, and TRI is entitled to $3,136.58 for its expenses.[10]

9. RCFP and TRI argue that the President is being required to reimburse this Court the entire amount of costs incurred in attending his January 17th deposition, not just 20%, and that plaintiff likewise should be reimbursed for all fees and expenses incurred in connection with the deposition. The Court disagrees. The President was noticed for deposition prior to the actions which gave rise to the April 12th Order, and plaintiff's counsel would have incurred fees and expenses in connection with the deposition regardless of any misconduct on the part of the President. This Court, on the other hand, would not have incurred any expenses in connection with the deposition had the President not requested that the Court preside over the proceedings at which he ultimately disobeyed this Court's oral ruling that certain questions be answered. *See Jones v. Clinton*, 36 F.Supp.2d at 1127. Thus, the Court deems its expenses incurred in connection with the President's misconduct at his deposition to be the total expenses incurred by this Court in traveling to Washington, D.C. at the President's request to preside over the proceedings. As for awarding plaintiff even 20%, this apportionment, as correctly noted by the President, reflects an assumption highly favorable to plaintiff that all of the Lewinsky matter was violative of this Court's discovery Orders.

10. The President argues that plaintiff's counsel has included fees for six attorneys to attend his deposition, even though only one RCFP attorney questioned the President, and that fees for such duplicative services should be disallowed. The Court notes, however, that the President himself had five attorneys—including the White House Counsel—in attendance at the deposition. Given the unique circumstances of this case, this Court does not find it unreasonable that plaintiff had more than one attorney in attendance.

d.

The Court will disallow fees and expenses associated both with plaintiff's motion for this Court to reconsider its ruling excluding the Lewinsky evidence at trial and her subsequent petition for a writ of mandamus with the Court of Appeals for the Eighth Circuit seeking to overturn that ruling.[11] The Court excluded the Lewinsky evidence from trial, not in response to any misconduct on the part of the President, but in response to a motion by OIC for limited intervention and stay of discovery in this civil case. *See Jones v. Clinton,* 993 F.Supp. 1217 (E.D.Ark.1998) (Order denying motion to reconsider ruling excluding Lewinsky evidence from trial).[12] Thus, the fees and expenses associated with attempts by plaintiff's counsel to overturn this Court's Lewinsky ruling were not caused by the President's willful failure to obey this Court's discovery Orders and, therefore, are not compensable.

RCFP, however, argues that if the President had told the truth on January 17, 1998, their discovery related to Ms. Lewinsky would then have been completed and OIC's motion would never have been filed. Reply of RCFP, at 6. They argue that this Court then would not have been asked to stay discovery related to Ms. Lewinsky because very little, if any, additional discovery related to her would have been sought, and this Court would not have had occasion to consider at that stage excluding the evidence at trial. *Id.*

While the Court does not question RCFP's representations as made in hindsight, the Court is hard pressed to conclude that plaintiff, given the intensity and contentiousness with which discovery was then being conducted, would not at that time have proceeded with depositions of Linda Tripp, Betty Currie, Vernon Jordan, and other witnesses in an effort to confirm or learn additional details of the relationship between Ms. Lewinsky and the President and, perhaps, to establish or discount through these witnesses the existence of any other relationships that might be relevant to the issues in the case. Moreover, even had the President told the truth with respect to Ms. Lewinsky, there is nothing in the record before the Court to indicate that Ms. Lewinsky would not at that time have continued to stand by her affidavit denying sexual relations between herself and the President, thus necessitating additional related discovery by plaintiff.[13] The

---

**11.** RCFP later withdrew this petition following this Court's grant of summary judgment to defendants on April 1, 1998.

**12.** OIC argued in its motion that counsel for plaintiff were deliberately shadowing the grand jury's investigation of the Lewinsky matter and that "the pending criminal investigation is of such gravity and paramount importance that this Court would do a disservice to the Nation if it were to permit the unfettered—and extraordinarily aggressive—discovery efforts currently underway to proceed unabated." *Id.* at 1218 (quoting OIC Motion, at 2–3). This Court made the decision to disallow discovery as to Ms. Lewinsky and to exclude evidence concerning her from trial because its admission would frustrate the timely resolution of this case and cause undue expense and delay, the substantial interests of the Presidency militated against any undue delay that would be occasioned by allowing plaintiff to pursue the Lewinsky matter, and the government's criminal proceedings (to which this Court generally must yield in civil

matters) could be impaired and prejudiced were the Court to permit inquiry into the Lewinsky matter by the parties in this civil case. *Id.* at 1219–20. The Court noted that evidence of the Lewinsky matter, even assuming it to be very favorable to plaintiff, was not essential to the core issues in this case of whether plaintiff herself was the victim of *quid pro quo* sexual harassment, hostile work environment harassment, or intentional infliction of emotional distress. *Id.* at 1222. *See also Jones v. Clinton,* 36 F.Supp.2d at 1122 n. 7.

**13.** Not included in the record of this case are many materials, including the transcript of Ms. Lewinsky's grand jury testimony and transcripts of depositions generated in the course of this litigation, that might reveal additional instances of misconduct other than those described in the Court's April 12th Order. Such materials are not normally filed of record and, thus, are not part of the official record to be considered by this Court. Indeed, because such materials are not normal-

Court simply cannot infer that OIC would not have intervened in this case had the President acknowledged a relationship between himself and Ms. Lewinsky on January 17th and that additional related discovery on the part of the plaintiff would thereby have ceased.[14] Such would require speculation and involves events that are not of record in this case. *See* n. 13, *supra.* Accordingly, the Court disallows fees and expenses associated with the attempts by plaintiff's counsel to overturn this Court's Lewinsky ruling.[15]

e.

The Court will allow fees and expenses associated with preparing to depose Ms. Lewinsky, attempting to substantiate the Lewinsky allegations, responding to her motion for a protective order, and traveling to Washington, D.C. for her deposition. The President acknowledges that fees and expenses incurred by plaintiff in seeking Lewinsky evidence subsequent to the actions upon which the Court's April 12th Order is based and prior to the decision by

this Court to exclude that evidence from trial fall within the Court's Order. The Court agrees and, therefore, RCFP is entitled to $12,316.00 for fees and expenses associated with these activities, and TRI is entitled to $5,545.85 for its fees and expenses.

f.

The Court will allow fees and expenses associated with the motion for summary judgment and the subsequent appeal to the Eighth Circuit following this Court's grant of summary judgment to defendants, but only to the extent that plaintiff's brief on summary judgment and her appeal dealt with the President's falsehoods and alleged obstruction of justice concerning Monica Lewinsky. Unlike the matter involving this Court's evidentiary ruling excluding the Lewinsky evidence from trial, this Court has no difficulty in concluding that these fees and expenses would not have been incurred had the President not willfully failed to obey this Court's discovery Orders.[16] Accordingly, RCFP is enti-

ly filed of record, the transcript of the President's January 17th deposition had not been filed of record until just recently. In this regard, the Court, prior to considering the issue of the President's possible contempt following his August 17, 1998 address to the Nation and prior to issuing its April 12th Order, had to expand the record by first obtaining, and then filing of record, the following items: (1) President Clinton's Responses to Plaintiff's Second Set of Interrogatories; (2) President Clinton's Supplemental Responses to Plaintiff's Second Set of Interrogatories; (3) the redacted transcript of the January 17, 1998 deposition of President Clinton; (4) the transcript of the August 17, 1998 videotaped grand jury testimony of President Clinton; and (5) the transcript of President Clinton's August 17, 1998 televised address to the Nation. *See* Order of April 12, 1999 [doc. #478]. While the Court certainly could further expand the record of this case and convene hearings to address other possible instances of misconduct beyond those upon which the April 12th Order is based, the Court, in the interests of the Presidency and in order to bring this matter to a speedy closure, declines to do so.

14. The Court notes that OIC was given authorization to investigate the President's conduct

in this case prior to the January 17th deposition.

15. Likewise, the Court will disallow fees and expenses associated with responding to OIC subpoenas.

16. RCFP and TRI have included many general time entries with respect to the work spent on the motion for summary judgment and subsequent appeal that do not specify which hours were spent for which activities. The Court recognizes, however, that plaintiff's counsel were not anticipating at the time they recorded these time entries that they would later be asked to segregate the time spent as a result of the President's misconduct. Accordingly, rather than disallow these time entries in their entirety, the Court has reduced the total number of hours claimed in these time entries to a number of hours that this Court deems reasonable for work spent on that compensable portion of the time entry. Thus, for example, where a time entry claims compensation for, say, six hours spent drafting a response to the President's motion for summary judgment, the Court, notwithstanding RCFP's assertion that all of the time entries dealt with the President's falsehoods and alleged obstruction of justice, has reduced the

tled to $27,687.37 for fees and expenses associated with the motion for summary judgment and subsequent appeal, and TRI is entitled to $802.50 for its fees and expenses.

g.

The Court will allow fees and expenses associated with researching contempt and spoilation issues following the President's August 17, 1998 televised Address to the Nation, and in responding to this Court's request for a transcript of the President's deposition. Although RCFP never filed a motion for contempt following the President's August 17th Address, the fees and expenses associated with these activities would have been unnecessary had the President followed this Court's discovery Orders. Accordingly, RCFP is entitled to $22,235.25 for fees and expenses associated with these activities.[17]

h.

Finally, the Court finds that RCFP is entitled to $12,527.50 for fees and expenses associated with reviewing and responding to this Court's April 12th Order requiring plaintiff's former counsel to submit a statement of reasonable fees and expenses.[18]

III.

°The Court takes no pleasure in imposing contempt sanctions against this Nation's President and, no doubt like many others, grows weary of this matter. Nevertheless, the Court has determined that the President deliberately violated this Court's discovery Orders, thereby undermining the integrity of the judicial system, and that sanctions must be imposed to redress the President's misconduct and to deter others who might consider emulating the Presi-

dent's misconduct. *See Jones v. Clinton,* 36 F.Supp.2d at 1131–32, 1134. Accordingly, the Court hereby orders the following:

1. The President shall deposit the sum of $1,202.00 into the registry of this Court within sixty (60) days of the date of entry of this Memorandum and Order.

2. The President shall pay RCFP the sum of $79,999.12 within sixty (60) days of the date of entry of this Memorandum and Order.

3. The President shall pay TRI the sum of $9,484.93 within sixty (60) days of the date of entry of this Memorandum and Order.

IT IS SO ORDERED this 29th day of July 1999.

hours claimed for that activity to a number that this Court would deem reasonable for time spent only on that portion of the response dealing with the President's falsehoods and alleged obstruction of justice concerning Ms. Lewinsky. While this process might not be exact, the Court believes it represents a fair and expeditious solution to determining the sum total of reasonable fees and expenses that plaintiff incurred as a result of the Presi-

dent's willful failure to obey this Court's discovery Orders.

17. TRI does not appear to claim any fees and expenses with respect to these activities.

18. Again, TRI does not appear to claim any fees and expenses with respect to these activities.